WO

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Cormier o/b/o Anthony Reed,<br><br>   Plaintiff,<br>v.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>   Defendant. | CV 07-490 TUC DCB<br><br>**ORDER** |

Plaintiff seeks review of the Decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The parties have filed crossmotions for summary judgment. The Court grants the Plaintiff's Motion for Summary Judgment as to the request that the case be remanded to the Administrative Law Judge for further development of the record. The Defendant's Motion for Summary Judgment is denied.

Background and Statement of the Law

Pamela Cormier, Plaintiff Anthony Reed's grandmother, filed an application for Supplemental Security Insurance (SSI) benefits on his behalf on January 20, 2004, (TR at 76), with a protective filing date of December 31, 2003.[1] Anthony Reed allegedly suffers from Attention Deficit/Hyperactivity Disorder(ADHD), anxiety, and an eating disorder. He was also a victim of child abuse and has been diagnosed with Post Traumatic Stress Disorder (PTSD). He alleges he has been disabled since January 1, 2000.

---

[1] The Protective Filing Date is the date the Social Security Administration (SSA) is first contacted and may be earlier than the date the signed application is received by SSA.

The Social Security Administration (SSA) denied the claim on September 10, 2004. Plaintiff sought reconsideration, which resulted in an administrative hearing on February 2, 2006, before the Administrative Law Judge (ALJ) Norman R. Buls, who issued a decision denying Plaintiff SSI benefits on June 30, 2006. (TR at 18-29.) Plaintiff sought review, but the Appeals Council denied review on June 25, 2007, making the ALJ's decision the final Decision of the Commissioner. On September 28, 2007, the Plaintiff filed the Complaint for judicial review of the denial of benefits.

This Court reviews the Commissioner's Decision to determine whether it is free of legal error, and whether it is supported by substantial evidence. *Brawner v. Secretary of Health & Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (Secretary's decision to deny benefits will be disturbed only if it is not supported by substantial evidence or it is based on legal error); *see also*, 42 U.S.C. § 405(g) (1982). "Substantial evidence" is "more than a scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th cir. 1975); *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "Substantial evidence" is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In determining whether there is substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985). If the Court finds legal error or that the Commissioner's Decision is not supported by substantial evidence, it will set aside the denial of benefits. 42 U.S.C. § 405(g); *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986); *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985).

Plaintiff Anthony Reed was ten years old when his grandmother filed the application for SSI benefits. He was 13 when the ALJ issued the Decision, and he is 15 years old now.

2

To be considered disabled and eligible for SSI benefits, a child under the age of 18 must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 1382(a)(3)(C)(i). The ALJ follows a three-step sequential evaluation to determine a child's eligibility for SSI. 20 C.F.R. § 416.924. First, a child is disabled if he is not working or engaged in substantial gainful activity. Second, the child must have a medically determinable impairment or combination of impairments that is severe, and third, the impairment(s) must meet, medically equal, or functionally equal the severity of impairments listed in 20 C.F.R. § 404, subpart P, app.1.

To be functionally equal to the listed impairments, a child must show "marked" limitations in two domains of functioning or "extreme" limitations in one domain. 20 C.F.R. § 416.926(a). A "marked limitation" exists when an impairment "seriously interferes" with the ability to independently initiate, sustain, or complete activities. A marked limitation means a limitation that is more than moderate and less than extreme.[2] (TR at 20: Decision at 3.) Extreme limitations are more than marked and very seriously interfere with a child's ability to initiate, sustain, or complete activities. *Id.* at 20-21.

There are six development and functioning domains, which include: 1) acquiring and using information; 2) attending to and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) one's health and physical well-being. 20 C.F.R. §416.926a(b)(1)(i)-(iv).

---

[2]Such as: functioning on standardized testing with scores that are at least two, but less than three, standard deviations below the mean or such a score on a comprehensive standardized test designed to measure ability or functioning in that domain, and his day-to-day functioning in domain-related activities is consistent with that score, or in the domain of health and physical well-being there are episodes of illness or exacerbations that result in significant, documented symptoms or signs that occur on an average of three times a year, or once every 4 months, each lasting 2 weeks or more, etc.,   (TR at 20: Decision at 3.)

3

The ALJ's Decision

The ALJ determined that Reed was not engaging in substantial gainful activity, and he has a medically determinable impairment or combination of impairments, specifically ADHD and an eating disorder, that are "severe" because they significantly limit his ability to perform basic work activities. (TR at 21.) At step three, the ALJ found that his severe impairment or combination of impairments does not meet or medically equal the criteria of a listed impairment; his eating disorder did not meet listed impairment 100.00 (Growth Impairment) and his ADHD did not meet 112.00 (Mental Disorders), Part B, Appendix 1, Regulations No. 4. (TR at 21.) The ALJ found that Plaintiff's impairments or combination of impairments did not functionally equal the listings. (TR at 22-29.)

The ALJ accurately recounted the Plaintiff and his grandmother's testimony at the hearing, where the Plaintiff testified first, followed by his grandmother so that she could explain his statements if necessary. (TR at 255.)

Plaintiff Reed testified that he was in the 7th grade. He walked a few blocks to school in the morning and home after school. He liked to play football at recess and lunch. He was on the honor roll and enjoyed reading mystery books such as Lemony Snicket's A series of Unfortunate Events.[3] He admitted to being disruptive in class at times and that he received warnings from his teachers, but said he had not been placed in detention. *Id.* at 22 (citing TR at 255-256: Hearing, February 22, 2006).

Plaintiff reported that his grandmother has to remind him to take his medicine or he forgets, and if he doesn't take it he gets in trouble at school. His grandmother makes him do chores, including cleaning his room, making his bed, taking out the garbage, and feeding the dog. He admitted to yelling at and being mean to his two brothers that also live with his grandmother. *Id*.

---

[3]Appropriate reading for ages 10 and up. www.kidsreads.com, Book Club Guide.

4

The grandmother testified that the Plaintiff had difficulty concentrating on school work when he became hyper or depressed; she indicated that he had an eating disorder and was becoming more depressed. He was a very fussy eater, and would also forget to eat – sometimes for the whole day. He lost weight rapidly as a result of his eating disorder. Plaintiff was in special education for math. The grandmother testified that she had to work with the school personnel to keep him organized and focused and ensure that he turned in his assignments. *Id*. at 22.[4]

The ALJ found the medical record established determinable impairments that could reasonably be expected to produce the alleged symptoms, but rejected the grandmother's statements concerning the intensity, duration and limiting effects of the claimant's symptoms as not entirely credible. *Id*. at 22.

The ALJ found that the objective medical evidence reflected that Reed was cooperative and friendly with average intelligence and normal motor skills, although he had difficulty focusing and maintaining attention and can be disruptive in the classroom, and had eating issues related to his psychological impairment.

A number of examiners noted Plaintiff's functional limitations resulting from his chaotic early childhood, but he had overall improved since living with his grandmother. The ALJ noted that he had previously been on medication, but it was discontinued and not re-

---

[4]The grandmother described a child unable to responsibly perform normal activities or do his school work. She identified his disorganization was a primary reason for his math problems. He is easily distracted and requires a great deal of assistance and guidance from his teachers and grandmother for him to complete his school-work. He cannot responsibly engage in normal activities such as visiting friends because he loses track of time and forgets to call or come home. She had to enroll him in an after school program because when he walked home from school he would lose track of time and not arrive home until 7pm. She explained he becomes easily frustrated, angered, and very emotional when he is unable to focus and successfully perform these normal tasks. It takes a long time to calm him down so he can return to the task at hand. She described this was how he was on medication, and he was worse without his medication, plus he had difficulty sleeping without the medication. (TR at 266-272: Hearing, February 22, 2006.)

prescribed again until May 2004. *Id.* (citing Ex 5F: Providence treatment records (Providence)). Intelligence testing placed him in the average range, but teachers noted problems with completion of assignments and maintaining focus. *Id.* (citing Ex.3F: Dr. Van De Voorde, Psychological Examination (Dr. Van De Voorde)).

The ALJ found only one examiner had described the Plaintiff as aloof and withdrawn, *id.* at 23 (citing Ex. 5F: Providence), to corroborate the grandmother's testimony of behavioral problems such as being sassy, restless, fearful, shy, and basically unhappy. Instead, a number of examiners and claimant's teachers did not depict him in this manner. *Id.* at 23 (citing Ex. 2F: Dr. Yost, Psychiatric evaluation (Dr. Yost), 3F: Dr. Van De Voorde, 7F: Dr. Chavez, Physical Examination (Dr. Chavez), 9F/7-11: Providence.) His teachers described him as acting inappropriately because he was impulsive and expressed his feelings in unacceptable ways. *Id.* The grandmother testified that he was taken off Prozac because he was losing weight, but that conflicted with testimony that Prozac was stopped because he appeared more agitated when taking it. *Id.* (citing Ex. 7F:Dr. Chavez, 9F/18:Providence).

According to the ALJ, ongoing psychiatric appointments were sporadic and infrequent, with his initial response to medication being good, but then the impact faded. *Id.* (citing Ex 5F: Providence.) After medication adjustments in March 2005, the claimant was doing better with less hyperactivity and aggression. He was doing well in school and appeared to be age appropriately playing sports. *Id.* (citing Ex. 9F:Providence).

The ALJ gave "great weight" to the assessments and opinions of the examining psychiatrist and psychologist Drs. Yost and Van de Voorde, who both noted some problems with attending and completing tasks, but otherwise found Plaintiff to be age-appropriate. *Id.* (citing Ex. 2F:Dr. Yost, 3F: Dr. Van De Voorde). Nevertheless, the ALJ believed the Plaintiff to be somewhat more limited in caring for himself and his health and physical well-being than these examining doctors, who had found he had no such limitations. *Id.*

The ALJ agreed with the State agency reviewing doctors' findings of "less than marked limitations" in the domain of caring for yourself, *id.* (citing Ex. 6F:SSA Dr.

6

Tangeman), and that Plaintiff's eating disorder was non-severe, *id.* (citing Ex. 8F:SSA Dr. Stafford). The ALJ, however, gave little weight to the State agency opinions, *id.* (citing Ex. 4F: SSA Dr. Marks, 6F:6F:SSA Dr. Tangeman, an 8F:SSA Dr. Stafford), which found Reed had "less than marked limitations" in the domains of acquiring and using information and interacting and relating to others because he believed consultative exam findings supported a finding that Reed had no such limitations. *Id.*

Based on the record most favorable to the Plaintiff, the ALJ found he had severe impairments of ADHD and an eating disorder. *Id.* at 21. The ALJ then addressed the record in respect to the six domains of function. *Id.* at 23-29.[5]

1. <u>Acquiring and Using Information</u>:

This domain measures how well the claimant is able to acquire or learn information and how well he uses the information he has learned. The ALJ found the Plaintiff has no limitation in acquiring and using information. *Id.* at 24.

The ALJ relied on the results of the Wechsler Intelligence Scale for Children-III, which placed him in the average range. There was good performance on tests requiring general fund of knowledge, word meaning, and categorization skills but poor results on tests of arithmetic and social judgment. He made no errors on the Bender Gestalt. He understood what he was being asked to do and carried out the tasks assigned to him. *Id.* (citing Ex. 3F:Dr. Van De Voorde).

Consistent with his poor arithmetic testing, he was placed in a special education math class. There were no report cards submitted, but Reed testified that he was on the honor roll and a progress report from February 2004, indicated he was earning As, Bs, and Cs. His lowest grades, Cs, were in science and homework which was consistent with the math teacher's statements that his grades were affected and lowered due to his dis-organization

---

[5]When addressing Reed's limitations in respect to these domains, the ALJ should have considered the combined effects of all of Reed's medically determinable impairments, which were ADHD, PTSD, anxiety, sleeping disorder, and eating disorder.

7

resulting in lost assignments. *Id.* (citing Ex. 1E/43: Teacher Questionnaire.) His regular teacher noted only slight problems in comprehending and doing math. *Id.* (citing Ex. 1E/50: Teacher Questionnaire).

### 2. Attending and Completing Tasks:

This domain considers how well the Plaintiff is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities. The ALJ found the Plaintiff has less than marked limitation in attending to and completing tasks. *Id.* at 25.

The ALJ relied on the treatment record, which documented distractibility and restlessness during an intake interview and hyperactivity at medical appointments despite medication. *Id.* (citing Ex. 9F/7-11:Providence, 7F:Dr. Chavez). When given instructions by the consulting psychiatrist, the Plaintiff missed two of the three steps. *Id.* (citing Ex. 2F:Dr. Yost). His regular teacher noted his serious attention problem and that he had a great deal of difficulty staying focused and remaining on task. He was disruptive in class by talking to others, and his constant physical movement and impulsivity at school was a problem. *Id.* (citing Ex. 3F:Dr. Van De Voorde, 1E/51, 1E/28, 1E/27: Teacher Report). His math teacher noted his disorganization was so bad it affected his grade. His grandmother testified that he forgot to turn in homework assignments and needed constant reminders to eat and take his medication. *Id.*

### 3. Interacting and Relating with Others:

This domain considers how well the Plaintiff is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. The ALJ found that the Plaintiff had no limitation in interacting and relating to others. *Id.* at 26.

The ALJ relied on statements from a number of examiners that the Plaintiff was pleasant, agreeable, cooperative, and answers questions directly; the psychologists described

8

him as open, friendly, and outgoing, *id.* (citing Ex. 2F:Dr. Yost, 3F:Dr. Van De Voorde, 7F:Dr. Chavez, 9F:Providence), and only one examiner described him as aloof and withdrawn, *id.* (citing 5F/8: Providence.) The Plaintiff described himself as making everybody laugh: "It's bad for my teacher but I enjoy it." *Id.* (citing Ex. 3F/3:Dr. Van De Voorde). His teacher observed he was liked by his classmates. *Id.* (citing Ex. 1E/56: Teacher Questionnaire).

        4. <u>Moving About and Manipulating Objects:</u>

This domain measures how well the Plaintiff is able to move his body from one place to another and how he moves and manipulates objects using gross and fine motor skills. The ALJ found that the Plaintiff has no limitation in moving and manipulating objects. *Id.* at 27.

There are no allegations that Plaintiff had any difficulty with gross or fine motor skills, *id.* (citing Ex. 1E/75: Disability Appeal), nor any problems noted during the consultative physical exam, *id.* (citing Ex. 7F:Dr. Chavez). He enjoys swimming, bike riding and playing football, and is able to do chores at home. *Id.*

        5. <u>Caring for Yourself:</u>

This domain considers how well the Plaintiff maintains a healthy emotional and physical state, including how well he satisfies his physical and emotional wants and needs in appropriate ways. It includes how he copes with stress and changes in the environment and whether he takes care of his own health, possessions, and living area. The ALJ found that the Plaintiff has less than marked limitations in his ability to care for himself. *Id.* at 27-28.

The ALJ relied on Reed's grandmother and teacher's opinions that he was easily frustrated. *Id.* (citing Ex. 1E/54: Teacher Questionnaire). He had difficulty in consistently controlling his behavior and sought attention in inappropriate ways, had trouble taking turns in conversations, and had problems following the rules. *Id.* (citing Ex. 1E/52, 1E/28, 1E/27: Teacher Report). The ALJ accepted the opinion of Dr. Van De Voorde, the examining psychologist, that the Plaintiff seemed to enjoy being a troublemaker and making his

classmates laugh but recognized that his behavior was disruptive to the class and got him in trouble as he received warnings regarding his behavior from his teachers. *Id.* (citing Ex. 3F/3:Dr. Van De Voorde).

### 6. Health and Physical Well-Being:

This domain measures the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on the child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. The ALJ found the Plaintiff has less than marked limitation in health and physical well-being. *Id.* at 28-29.

The ALJ considered the Plaintiff's eating disorder and found that the treatment record indicated he needed reminders to eat and his appetite was poor, resulting in him being underweight and underheight. *Id.* (citing Ex. 2F:Dr. Yost, 7F:Dr. Chavez, 9F/18:Providence). A consultative exam in March 2005, found the Plaintiff to weigh 75 pounds (25 percentile) and that he was 4feet 7.5 inches tall (10 percentile), and reflected his eating disorder caused him to be under weight and under height, *id.* at 23 (citing 7F/3:Dr. Chavez), and was a manifestation of his psychological impairment as supported by inference from statements of his grandmother. *Id.* at 23.

The ALJ concluded that Plaintiff does not have an impairment or combination of impairments that results in either a marked limitation in two domains or extreme limitation in one domain of function.

### Judicial Review of the Decision and the Record

Reed began living with his grandmother in October of 2003. He was 10 years old.

On December 22, 2003, Plaintiff was seen at Providence of Arizona for a Biopsychosocial Assessment because of behavioral problems at school. He was "having a hard time sitting still, having fidgety hands, always staying up late and getting up early, not paying attention, rushing through school work, and struggling to complete homework some days." (TR at 218.) The grandmother reported that he had previously been diagnosed with

10

ADHD and had been prescribed medication. She reported that he was raised in a significantly chaotic environment due to his mother's mental health issues, alcohol and drug use, and ongoing domestic violence between her and her partners. (TR at 222.)

The intake therapist, reported that the Plaintiff was very clingy and attached to the grandmother and cried when she left the room. The intake therapist reported that Plaintiff seemed intelligent and cooperative, overall, but displayed distractibility and restlessness during the intake interview. He was referred to a therapist/counselor for a psychiatric evaluation. *Id.*

On April 26, 2004, the school determined that Reed was an individual with a disability and enrolled him in special education for mathematics and social and emotional behavioral support. (TR at 116-119.) They described him as meeting developmental milestones within normal limits but having "an inability to learn which cannot be explained by intellectual, sensory, or other health factors." (TR at 117.) In summary, the school found that his intelligence was in the low-average to average range. According to the Arizona Academic Standards for Achievement, his skills corresponded to this level. His communication skills, self-help skills and motor skills were age-appropriate. The school noted a history of social/emotional and behavioral problems (attention, organizational, cognitive distortions, anxiety and self-esteem) at school. (TR at 118.)

As part of the school's disability determination, Plaintiff Reed's teachers completed questionnaires regarding their opinions on the same six development and functioning domains at issue here.

On April 12, 2004, his special education math teacher, who had been teaching him for approximately 6 months, 30 minutes every day, reported the following: 1) slight to obvious problems acquiring and using information, especially as it related to organizing oral explanations and descriptions and problem-solving in class discussions; 2) a serious problem in many aspects of attending to and completing tasks; 3) none or only slight problems interacting and relating with others; 4) no problems moving about and manipulating objects;

5) slight problems in caring for oneself as it related to coping skills; and 6) no health and physical well-being issues. The special education teacher explained that Reed's disorganization and frequent loss of assignments was so serious it was affecting his grades, and his extreme distraction in class required "a great deal" of redirection.

On April 6, 2004, Reed's regular class-room teacher, who had him for approximately 5 hours every day, reported as follows:1) slight to obvious problems acquiring and using information, especially as it related to organizing oral and written explanations and descriptions; 2) a serious to very serious problem in many aspects of attending to and completing tasks, especially when changing from one activity to another without being disruptive and working without distracting self or others; 3) some serious problems interacting and relating with others, when following rules or asking for permission; 4) no problems moving about and manipulating objects; 5) slight to obvious problems in caring for oneself as it related to being patient and coping skills; and 6) no health and physical well-being issues. His teacher explained that Reed had to sit apart from the rest of the students because he had a serious attention problem, talked constantly to others, constantly needed to keep moving, and had a hard time focusing. The teacher described him as a very loving person, who wants to please and do things right, but is a constant distraction to the class and himself on a continuous and daily basis. (TR at 128-135.)

Plaintiff had a psychiatric evaluation at Providence on May 14, 2004, by therapist/counselor Ann E. Maier, Nurse Practitioner (NP), who provided diagnostic impressions as follows: Axis I (ADHD, Chronic Motor/Vocal tic (twitching eye) and PTSD), Axis II (Learning Disorder), Axis III (NKDA (no known drug allergies) and under weight), AXIS IV (moderate to severe), and AXIS V (GAF 56)[6]. (TR at 194.) She prescribed trial

---

[6]A GAF of 51 to 60 reflects moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers ). http://www.bsu.edu; *see also* Plaintiff's Response at 3.

12

medications of Ritalin for ADHD, Tenex for the sleep disorder, and Prozac for PTSD. (TR at 194.)

That same week on May 12, the Plaintiff saw Dr. Hunter Yost, for an SSA psychiatric evaluation. Dr. Yost, noted that Reed alleged ADHD, anxiety disorder and depression. Dr. Yost's diagnosis was Axis I (ADHD), Axis II (No diagnosis), Axis III (post intestinal surgery age 7), Axis IV (Social support with current family), and Axis V (GAF 40 to 50).[7] Dr. Yost summarized his findings as: " . . . According to the grandmother's descriptions, there are significant attention and concentration problems at school with over-activity, as well as over-activity at home." (TR at 169.)

On examination, Dr. Yost found Reed to not have excessive fidgeting or agitation, to be cooperative, answered all questions directly, was pleasant and smiling, no evidence of depression, with grammar and vocabulary typical of an 11-year-old child. Dr. Yost recorded that Reed did not voice any homicidal or suicidal thoughts. Reed knew it was 2004, named the season as Spring, the date as Wednesday, May 12, he knew he lived in the State of Arizona, City of Tucson, and knew he was seeing Dr. Yost "to talk." He did not know the street of the office. Plaintiff remembered three out of three words on immediate recall, and three out of three words on delayed recall. He was able to subtract 3 from 10 down to 1 correctly. *Id.*

On a three-part test for following instructions, Reed only got 1 out of 3 correct. He took the paper in his left hand, instead of his right hand, and folded the paper, but did not put it in his lap. He wrote the sentence, "Hello, my name is Anthony. He correctly drew two intersecting five-sided figures. Plaintiff named the current president as Bush, said an apple and orange are both fruit, and you ride both a bicycle and a train. He said if he saw a backpack laying on the school yard, he would leave it alone. (TR at 168.)

---

[7]A GAF of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

13

Dr. Yost found no evidence of a thought disorder. There were no hallucinations or delusions. *Id.*

In June, 2004, Plaintiff was seen at Providence. Again, NP Maier reported that he exhibited the blinking-eye tic. She recorded that there had been initial improvement with medication but it seemed to fade, and Plaintiff was more aggressive and argumentative. She described him as aloof and withdrawn, and his mood was apathetic, his affect was flat, his concentration was fair. (TR at 188-189.)

On July 7, 2004, NP Maier reported that Plaintiff's grandmother called to say he was having flashbacks of early abuse and neglect and had become very upset and had some suicide ideation over the 4th of July holiday after seeing his mother. NP Maier recorded a poor response to the Ritalin and switched Plaintiff to Strattera for ADHD. It was planned that Reed would begin seeing a therapist/counselor at school.[8] (TR at 187.)

On August 12, 2004, Dr. Janet Van De Voorde, Ph.D., Clinical Neuropsychologist, saw Reed on a referral for SSA to assess his general intelligence, mental status and current level of functioning. She conducted a battery of tests. In summary, she concluded that Reed was not at all as described by his grandmother, which was "sassy, restless, fearful, with a chip on his shoulder, shy, bullying and basically unhappy." (TR at 175.) "Rather, he was open, friendly and outgoing. He was consistently obedient and accommodating, clearly wanting to please others and to be accepted. He had mild problems in spelling and arithmetic but he did not give evidence of impaired brain functions. He did not appear to be anxious nor did he describe any symptoms." *Id.* Dr. Van De Voorde believed that he enjoyed the role of troublemaker in school and kept it controlled; he was only reprimanded and never put in detention. She found he was able to concentrate, pay attention and follow directions, and his motor activity was well within normal limits. According to her, Reed did not appear to have a defined disability. (TR at 173-175.)

---

[8] See n. 9.

14

In September, 2004, Reed's 6th grade teachers, who had only been teaching him for the first couple of weeks of the new school year, reported continued difficulty in class. One teacher said he never stands up in line. He is always sitting on the ground or crouching. In class he is impulsive, talkative, and frequently blurts out comments. She described him as bright and usually achieves when he is self-disciplined, but that is <u>very</u> difficult for him. (TR at 106.) Another teacher, reported his behavior as "quite immature" for a 6th grader, usually trying to entertain other students instead of doing his own work or listening to the lesson; he wants to make everything into a joke, calling out comments throughout the class. This teacher reported that he had to constantly stay on him or Reed would accomplish little to nothing in class; he took an extreme amount of the teacher's time. The teacher described him as good hearted, but extremely disruptive. He constantly fidgets in his chair, taps his pencil, or plays with anything within reach. (TR at 107.)

On October 12, 2004, Plaintiff was seen at Providence. NP Maier recorded that he was still symptomatic for ADHD, but there was less depression and less anxiety. She continued and increased the Strattera. (TR at 183.)

On December 22, 2004, Providence completed an Annual Behavioral Health Update and Review Summary, which recorded that Plaintiff was taking Strattera and Prozac, and his grandmother reported he was doing a little better but still having problems with ADHD symptoms at school, such as poor focus and concentration. Individual school based therapy was to begin soon.[9] (TR at 213.)

On January 12, 2005, Providence conducted a welfare check. The record shows that Reed was being seen by Nancy Andrews, Providence, for therapy for PTSD.[10] His

---

[9]See n. 9.

[10]The evidence in the case suggests that Reed was seen at school by a therapist/counselor and by Nancy Andrews for therapy for PTSD, but the record fails to include their treatment records or opinions. This is a glaring omission, which should be remedied on remand.

15

grandmother had stopped giving him the Prozac because he seemed more agitated. Plaintiff's grades had dramatically improved, but Strattera seemed to wear off and he continued to have a reduction in appetite. NP Maier discontinued the Prozac and continued and increased the Strattera. (TR at 229.)

On March 11, 2005, NP Maier reported that Plaintiff was doing better, less hyper and aggressive. His grades were very good, and he was responding well to special education. The grandmother continued to be concerned about his lack of appetite, but he had improved mood, ADHD symptoms and functioning. He continued to see the school therapist/counselor.[11] (TR at 228.)

On July 11, 2005, NP Maier reported that Plaintiff's grades were good and Strattera seemed helpful, but grandmother was concerned regarding possible anorexia. Plaintiff appeared to be restricting food intake and was wearing layers of baggy clothes. NP Maier prescribed Remeron for appetite.[12] (TR at 227.)

On August 26, 2005, NP Maier saw the Plaintiff, and he reported doing well at school. She recorded "improved ADHD symptoms." She continued the Strattera and continued the Remeron. (TR at 226.)

On November 15, 2005, NP Maier saw Plaintiff for pharmacologic management, noted improved ADHD symptoms, and continued his medications.

Three months later, on February 22, 2006, the ALJ held the administrative hearing, where Reed testified that he was on the honor roll at school and his grandmother testified he was still in special education math class and one other special education class she could not remember. (TR at 271.) Reed was in the 7th grade by then, but no further school records were submitted to the ALJ regarding his academic performance.

---

[11] See n. 9.

[12] Remeron is an anti-depressant for the treatment of major depressive disorders. www.rxlist.com.

16

The Court finds that there are glaring omissions in the record, which makes it inadequate to support the ALJ's Decision that Reed has no limitation in acquiring and using information and less than marked limitation in attending and completing tasks. The ALJ must fully and fairly develop the record so that a just determination may be made. *Highfill v. Bowen*, 825 F.2d 112, 115 (8ty Cir. 1987); *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994). Here, Reed's school records and treatment records from his therapists/counselors are required for a just and fair determination.

The ALJ relied on Dr. Van De Voorde's opinion that Reed had only mild problems in spelling and arithmetic, instead of the school's assessment that his intelligence was in the low average to average range, (TR at 118), and ignored the significance of Reed's continued enrollment over a 3-year period in special education math classes and special accommodations for small group test administration, extended time to complete assignments, and modified arrangements and preferential testing. (TR at 117.)

When it comes to assessing how well a claimant acquires or learns information and how well he uses the information one of the considerations is whether he has difficulty solving mathematic questions or computing arithmetic answers. 20 CFR § 416.926a((g)(3). It is undisputed that Reed was at all time enrolled in special education classes for mathematics.

The ALJ must also consider how well he can use language to think about the world and to understand others and express himself. 20 CFR § 416.926a((g)(1). In the 5th grade both his special education teacher and regular teacher found he had an obvious problem organizing oral explanations and adequate descriptions and expressing ideas in written form. (TR at 121, 129.) In the 5th grade, the school was making special accommodations for his test taking and time for completing assignments.

In the 7th grade, Reed was still enrolled in special education math classes, which strongly suggests he had at least a marked limitation in acquiring and using mathematic information. In the 7th grade, Reed reported he was on the honor roll. This might mean that

he had no limitations in respect to other subjects. There is, however, evidence that special accommodations were made in other classes. If so, the obvious problems his 5th grade teachers saw in his ability to organize oral explanations and give adequate descriptions and express ideas in written form might be at least marked rather than "less than marked."

A review of Reed's academic record for the 5th and 6th grades, should answer these questions definitively. The ALJ should have reviewed Reed's standardized test scores[13] and all special accommodations whether he received them in his special education classes or in a regular classroom setting. The ALJ should take care to distinguish between success in a special education class and success in a regular class, and must determine the degree of assistance Reed needed in both. 20 CFR § 416.926a(b)(7). The ALJ must compare Reed's abilities to those of a normal student.

The ALJ concluded that Reed had "less than marked" limitations in attending and completing tasks because the treatment records reflected distractibility and restlessness despite medication. The ALJ accurately summarized the treatment record, but failed to offer any explanation for why he concluded the record reflects a "less than marked limitation" instead of the serious and very serious limitations described by Reed's teachers, his grandmother, and Dr. Yost. (TR at 122, 130, 106,7.) In the 5th grade, Reed's regular teacher believed Reed had a "very serious" limitation in this domain when changing from one activity to another and working without distracting self or others. *Id.* at 130. This same teacher additionally believed that Reed had a "very serious problem" interacting and relating with others, when it involved asking permission appropriately and following rules in the classroom. (TR at 131.) The ALJ ignores this evidence, which would require a finding that Reed had an extreme limitation.

---

[13]Test scores are one relevant piece of evidence used to determine disability. 416.924a(a)(1)(ii). The record in this case fails to include this important piece of evidence.

Generally, more weight is given to the opinions of a treating physician than to the opinions of doctors who do not treat a claimant, and the ALJ cannot reject these opinion without offering an explanation. *Lester v. Chater*, 81 F.3d 821,830 (9th Cir. 1995) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). They are employed to cure and they have a greater opportunity to know and observe the patient as an individual. *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). Here, the record is devoid of Reed's treating therapist/counselor's opinion. While his teachers are not treating doctors, they are similarly situated because they are employed to teach him and have a greater opportunity to know and observe limitations related to learning. The ALJ should have asked for the treating therapist/counselor's records and at least explained why he rejected Reed's teacher's opinions that Reed had serious and very serious limitations.

The ALJ should have asked for Reed's school records, given they are easily acquired and should reveal how well he acquires or learns information and how well he uses the information over a period of time. The evidence missing from the record prevents a fair and just decision. The case is remanded for the ALJ to develop the record by obtaining Reed's school records, showing both his academic performance, required disability related services, and his disciplinary record. Good grades, little assistance, and no disciplinary record will support a finding that Reed has less than marked or no serious limitations. Conversely, poor academic performance, without special accommodations in both special education classes and regular classes, and a disciplinary record of constant reprimands and detention, will support a finding that Reed has at least marked limitations in acquiring and using information, in part because he has at least a marked limitation in attending to and completing tasks, and at least a marked limitation in following classroom rules. It should not be difficult to compile Reed's school records to develop a full and complete picture of of his academic limitations. In the event Reed's school records reflects serious or very serious limitations, the grandmother's testimony regarding Reed's limitations shall be credible.

The school records may include the missing treatment records from Reed's therapist/counselor, if not these records should be otherwise secured. Once the ALJ has the school records and the treatment records from Reed's therapist/counselor, the ALJ will be able to make a fair decision.

**Accordingly,**

**IT IS ORDERED** that the Plaintiff's Motion for Summary (document 17) is GRANTED as to Plaintiff's request for remand to the ALJ to develop the record.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment (document 19) is DENIED.

**IT IS FURTHER ORDERED** that the Decision of the Commissioner is REVERSED and this action is REMANDED to the ALJ to further develop and consider the record as explained herein.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

DATED this 21st day of August, 2008.

David C. Bury
United States District Judge